90 So.2d 629 (1956)
Hoyt Dan DAVIS, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida. Division A.
November 16, 1956.
*630 Walter A. Shelley and Horn & Ossinsky, Daytona Beach, for appellant.
Richard W. Ervin, Atty. Gen., and Jack A. Sudduth, Tallahassee, for appellee.
THORNAL, Justice.
Having been tried on an indictment charging first degree murder, appellant Davis seeks reversal of a judgment of guilt and sentence to thirty years in the state prison pursuant to a verdict of the jury finding him guilty of second degree murder with a recommendation for mercy.
We are called upon to determine whether the evidence which was purely circumstantial was sufficient to support the verdict.
About 9:00 A.M., June 6, 1952, appellant approached a crew of men working at the west city limits of Ormond. He was in search of a telephone. He related a story that he and his wife had gone fishing early that morning on the banks of Little Tomoka Creek a short distance away. He stated that he had crossed a bridge over the creek and had dozed off on a blanket he laid in the thicket some distance on the other side. He said he was awakened around 8:00 o'clock when he heard his wife call "Hoyt". According to his story, she was fixing breakfast and fishing when he left; when he re-appeared in response to the call, his wife was nowhere to be found; he had searched for her, couldn't locate her and now wanted to telephone the sheriff's office to seek help. He then left the crew of men, drove down the road, located a telephone in a private home and called the deputy sheriff, repeating the same story. He met the deputy and the constable and they proceeded to the scene where they all searched extensively. Appellant consistently related the same account of the disappearance each time he told about it. The search continued throughout most of the morning when it was decided that they would go back into Ormond and contact the daughter of the missing wife, again at the suggestion of appellant. This they did around noontime. While in the city the deputy searched the trailer home of the parties with the consent of the appellant. Finding nothing, they returned to the scene of the tragedy. Between 2:00 and 2:30 P.M. after probing the creek bottom (with appellant assisting in the probing), the dead body of the missing wife came to the surface.
Appellant was placed under arrest and subsequently tried for first degree murder by drowning.
Appellant and deceased had been married about three months. There was testimony by neighbors and daughters of the deceased that he had abused her physically and had at times made threats against her.
There are hundreds of pages of testimony. We deem it unnecessary to attempt to delineate all of it for the reason that we do not consider this to be necessary to our determination of the case. Suffice it to emphasize that every item of testimony in any way pointing to the guilt of the accused is totally and completely circumstantial. There is not one item of direct evidence that connects him with the crime for which he was convicted.
Reverting to the summary above presented, it should be noted that from about 9:00 A.M. until the time the body was located, between 2:00 and 2:30 P.M., the accused was always in the company of police officers or other witnesses who appeared at the trial.
To support the allegation of the indictment that the deceased met her death by *631 drowning, the State offered the testimony of an expert pathologist. It was necessary to do this in order to establish the cause of death relied upon in the indictment. In the course of the examination of the doctor by the State's Attorney, the following testimony went into the record:
"Q. Doctor, can you determine how long Mrs. Ella Davis had been dead at the time you performed the Autopsy? A. What I give you is merely an estimate of the time, and I think that I estimated it at the time at roughly around 6 hours, plus or minus on either side. It is difficult to do that when a body has been immersed in water because it alters the usual signs.
"Q. 6 hours? A. Yes.
"Q. And you performed it at 6 o'clock, A. Yes.
"Q. So she wouldn't have been dead then until Noon? A. Now that is not necessarily so, Mr. Sams. I said that is an estimate of the time. I said roughly 6 hours one way, and I can't say she died at Noon.
"Q. Would say she hadn't died early in the morning? A. I don't believe she had, in my opinion.

"Q. What time do you think she did die? A. I would say somewhere around Noon.

"Q. Around Noon? A. Yes sir."
No other testimony as to the time of death was offered. The doctor's testimony was the only direct evidence on the real cause of death. If the doctor's testimony is to be believed, then the deceased met her death around noon the day of the tragedy. The whereabouts of the appellant is accounted for from about 9:00 A.M. During the period just before noon until approximately 1:00 o'clock, no one at all was at the scene of the tragic occurrence. During this interim everyone connected with the search, including appellant, was in town.
Appellant seeks reversal on the proposition that the circumstantial evidence does not meet the test sufficient to sustain his conviction. The State, on the contrary, contends that the evidence, though circumstantial, inescapably points to guilt.
In arriving at the conclusion which we hereafter announce, we are aware of the fact that circumstantial evidence is many times relied upon to support convictions for crimes. Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue. Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist. The conclusion as to the ultimate facts must be one which in the common experiences of men may reasonably be made on the basis of the known facts and circumstances. Wharton's Criminal Evidence, Sec. 6.
At the same time we must not lose sight of the basic proposition that one accused of a crime is presumed innocent until proved guilty beyond and to the exclusion of a reasonable doubt. It is the responsibility of the State to carry this burden. When the State relies upon purely circumstantial evidence to convict an accused, we have always required that such evidence must not only be consistent with the defendant's guilt but it must also be inconsistent with any reasonable hypothesis of innocence. Head v. State, Fla. 1952, 62 So.2d 41; Mayo v. State, Fla. 1954, 71 So.2d 899.
Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, it is not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial *632 evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence. So it is in the instant case we find implicit in the circumstantial evidence offered for conviction a possibility of innocence which is equally as strong as the possibility of guilt.
The pathologist who was the State's own witness, on direct examination, clearly established this possibility of innocence if his testimony is to be believed. We realize that it is the province of the jury to evaluate the credibility of expert witnesses. At the same time in the instant case it was the same expert witness upon whom the State relied to establish the cause of death which was an essential and salient factor in the State's case. We can find no justification for believing him in the one instance and disregarding his opinion in the other.
In passing we take note of the fact that this appellant was accused of a heinous crime. If the evidence was sufficient to sustain the verdict which the jury rendered it was actually adequate to sustain a conviction of first degree murder. Despite this fact, the jury which heard the case apparently within its own deliberations was dubious of the commission of the crime charged and reduced the offense to second degree murder with a recommendation for mercy. This was, of course, within the orbit of their authority as jurors. We have no way of piercing the protective cloak of secrecy that properly guards a jury's deliberations. However, under the facts and circumstances of this particular case, the ultimate verdict at least suggests to us that the jury itself was in doubt and therefore reluctant to prescribe the supreme penalty.
An added circumstance which suggests to us the justice of another trial in this case has to do with the comments of the trial judge after the verdict was rendered. Preliminary to sentencing the appellant, after commenting that in his view the jury would have been justified in bringing in a verdict of murder in the first degree, the judge added, "I personally think this was a brutal killing. I personally believe that you committed the deed. You did not see fit to take the stand in your defense. Now that the trial is over I can comment on that. The jury had no means of knowing whether you admitted or denied the things that were said against you." Thereafter, the appellant filed a motion for new trial which the judge promptly denied. While these comments obviously did not influence the course of the trial, we are of the view that the judge's reference to the failure of the defendant to testify in his own behalf obviously contributed to the trial judge's notion that the defendant was guilty. In such a state of mind and in giving weight to the fact that the defendant did not testify, a privilege which our organic law guarantees to him without adverse implications, it appears to us that the appellant could not have received on his motion for a new trial the unclouded and untarnished judgment of an impartial mediator. On the contrary, obviously improper elements entered into the Court's consideration of the sufficiency of the evidence on motion for new trial.
This phase of the matter, standing alone, might not justify a reversal, but taken in connection with the aspect of the case which we have pointed out above, it is our view that the applicable authorities as well as the justice of the case require that the appellant be tried again before another jury.
*633 The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.
Reversed and remanded.
DREW, C.J., and TERRELL and HOBSON, JJ., concur.