143 So.2d 484 (1962)
James A. WILLIAMS, Appellant,
v.
STATE of Florida, Appellee.
No. 31505.
Supreme Court of Florida.
May 23, 1962.
On Rehearing July 25, 1962.
*485 Paul Lake, Tampa, for appellant.
Richard W. Ervin, Atty. Gen., and James G. Mahorner, Asst. Atty. Gen., for appellee.
PER CURIAM.
July 16, 1958, the grand jury of Pinellas County filed an indictment in the circuit court charging James A. Williams with murder in the first degree in that, on the 26th day of April, 1958, he did unlawfully and with a premeditated design, shoot and kill Herman Kaplan with a deadly weapon, to wit, a pistol. November 14, 1960, the said James A. Williams came on for trial and on November 16, the jury returned a verdict of guilty of murder in the first degree without recommendation to mercy. Motion for new trial was seasonably made and overruled. December 7, 1960, the court adjudged the defendant guilty of murder in the first degree and sentenced him to be electrocuted. From the said judgment and sentence this appeal is prosecuted.
Appellant has urged eight questions as grounds for reversal, but we think they may be compressed into four questions as follows: (1) Is the evidence sufficient to support the verdict? (2) Did evidence relating to the crime at the Blue Grass Market May 24, 1958, 28 days after the crime at the H & K Market for which appellant was tried, exceed the bounds of relevancy as pointed out in Williams v. State, discussed later? (3) Did the trial court's demeanor towards defendant and his counsel, *486 during the trial, militate against defendant's receiving a fair and impartial trial? (4) Did the trial court commit error in permitting the jury to receive and carry with them to the jury room various forms of verdicts which had not been submitted to counsel for defendant?
We explore the second question first. Did the evidence relating to the crime at the Blue Grass Market, May 24, 1958, 28 days after the crime at the H & K Market for which appellant was being tried, exceed the bounds of relevancy?
In Williams v. State, Fla., 117 So.2d 473, appellant secured a reversal of a conviction for the identical offense for which he now seeks a second reversal. In said case we reiterated the rule governing the admission of evidence of other crimes in the trial of criminal cases which had been previously set forth in Williams v. State, Fla. 1959, 110 So.2d 654. The above opinions stand for the proposition that evidence of any facts relevant to a material fact in issue, except where the sole relevancy is character or propensity of the accused, is admissible unless precluded by some specific exception or rule of exclusion. Relevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime. Thus, for example, this court held that evidence pointing to the commission of another crime is admissible if it casts light upon the character of the crime under investigation by showing motive, intent, absence of mistake, common scheme, identity or a system or general pattern of criminality so that the evidence of the prior or subsequent offense would have a relevant or a material bearing on some essential aspect of the offense being tried.
In Williams v. State, supra, we further held that inasmuch as evidence of the later crime was admissible only because of its relevancy to the identity of the accused, the murder weapon and the similarity of pattern in the two robberies, the state went too far in its introduction of testimony about the later crime because the details of that testimony transcended the bounds of relevancy to the charge being tried, and made the later offense a feature instead of an incident of the offense being tried. The effect of such excessive testimony relating to the subsequent offense was to convert the development of facts relevant to the main issue of the guilt or innocence of the accused into an assault on his character in spite of the fact that defendant's character is insulated from attack unless he introduces the subject.
The unrelated crime about which relevant evidence is proffered was that committed at the Blue Grass Market in St. Petersburg 28 days after the crime at the H & K Market in which Herman Kaplan was killed and for which defendant was tried. Under the rule as here stated, only such evidence of the crime at the Blue Grass Market as is relevant to show or which tends to show that defendant was present and participated in both the Blue Grass Market crime and the crime at the H & K Market, that he used the same pistol in the perpetration of both crimes, and that both followed a similar pattern is admissible. One witness testified that he saw a "tall, dark, stout man" running away from the H & K Market soon after Kaplan was killed. Defendant did not answer to this description. There is no other direct evidence in this record that places defendant at or near the H & K Market when Kaplan was killed. We will give consideration to the weapon alleged to have been used in both crimes and the analysis of the spent bullets and cartridges by the ballistic expert later.
The indictment and trial of defendant was for the first degree murder of Herman Kaplan at the H & K Market. Most of the evidence has to do with an expose of the robbery and shooting at the Blue Grass Market. Many objects, such as pictures, bottles, pistols etc., were permitted to be introduced in evidence that *487 had nothing whatever to do with the identity of defendant, the weapon he used or that the two crimes in question followed a like pattern; not only that, said evidence transcended the bounds of relevancy as pointed out in Williams v. State, supra, and made the evidence of facts at the Blue Grass Market a feature instead of an incident, contrary to the opinion of this court in Williams v. State, supra. Measured by volume, the evidence relating to the shooting and holdup at the Blue Grass Market exceeded all other testimony combined and most of it was immaterial to show identity of defendant, murder weapon or similarity of pattern in the two crimes.
Officers who conducted the investigations of the murder of Kaplan at the H & K Market and the subsequent robbery and shooting at the Blue Grass Market recovered various bullets and cartridge casings which were sent to the F.B.I. laboratory in Washington for examination by firearms experts. Five bullets were recovered in or near the body of Kaplan. Five cartridge casings were recovered in the H & K Market within a short distance of the place where Kaplan's body was discovered. One bullets was recovered from the body of Smith at the Blue Grass Market, and two other bullets were recovered in the Blue Grass Market near the place where Smith was shot. Two cartridge casings were recovered in the Blue Grass Market. All of said bullets and cartridge casings were examined by Marion E. Williams, a special agent of the Federal Bureau of Investigation for twenty years, who was assigned to the F.B.I. laboratory in Washington. His duties were to examine firearms and give evidence as to his findings. The .25 caliber automatice pistol recovered from the trunk of the car in which the appellant was seen driving in Tampa, Florida, was also examined by Williams. At appellant's trial, Williams testified that his examination of all said bullets disclosed that each and every one of them were fired from the said .25 caliber automatic pistol. This examination consisted of comparing test-fired bullets from said .25 caliber pistol with the eight bullets recovered with the aid of an instrument known as a comparison-microscope. The microscopic examination of the bullets so testified about by Williams showed that those found at the H & K Market and those found at the Blue Grass Market had the same rifling markings produced on the bullet by the riflings of said .25 caliber pistol barrel. Williams also compared test-fired cartridge casings from the .25 caliber pistol with those recovered at the scene of both the H & K Market and the Blue Grass Market. This examination was also conducted with the aid of the instrument known as a comparison-microscope. From it Williams testified that he was able to identify four of said cartridge casings as having been fired from the .25 caliber pistol in question, but was unable to identify three of said cartridge casings because the markings produced on them by the working of the firing pin and the breech face of the pistol were insufficient to permit identification. Based on this evidence, the jury may have been warranted in believing the pistol used in the robbery and shooting at the Blue Grass Market was the same pistol which was used in shooting and killing Kaplan at the H & K Market.
Admittedly, the conviction in this case depends on circumstantial evidence. There is evidence which shows that the said pistol was purchased from a pawnbroker or loan office by Ned Taylor who said Timothy Taylor stole it from his [Ned Taylor's] home and pawned it to appellant early in 1958 for $3.50. Where this pistol was or who had it in possession from the time it was pawned early in 1958 to the time Smith was shot at the Blue Grass Market, approximately four months, is not shown. In view of this showing, the jury by its verdict necessarily inferred or presumed that appellant killed Kaplan solely because the pistol alleged to have been used by him at the Blue Grass Market was shown to be the identical pistol used in taking the *488 life of Kaplan at the H & K Market some 28 days previously. The evidence with reference to the use of the same pistol in both these tragedies when considered with the other evidence, or lack of it, does not exclude every hypothesis but guilt. When the state relies upon purely circumstantial evidence to convict an accused, we have always required that such evidence must not only be consistent with the defendant's guilt, but it must also be inconsistent with any reasonable hypothesis of innocence. Evidence such as is before us here, which furnishes nothing stronger than a deep suspicion the appellant committed the crime charged, is not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Davis v. State, Fla. 1956, 90 So.2d 629, 631. The present state of the record does not support the actual exclusion of every reasonable hypothesis of innocence when considered in the light of the testimony surrounding appellant's possession of the pistol.
It is next contended that the trial court's demeanor and attitude toward defendant and his counsel at the trial militated against defendant receiving a fair trial.
This is a serious charge and delicate one to treat. It is all the more so because the judge who presided at the trial is one of the best nisi prius judges in this country. The lawyer who represented defendant is also one of the better trial lawyers at the bar. We canonize the courthouse as the temple of justice. There is no more appropriate justification for this than the fact that it is the only place we know where the rich and poor, the good and the vicious, the rake and the rascal  in fact every category of social rectitude and social delinquent  may enter its portal with the assurance that they may controvert their differences in calm and dispassionate environment before an impartial judge and have their rights adjudicated in a fair and just manner. Such a pattern for administering justice inspires confidence. The legend on the seal of this court  "sat cito si recte" (soon enough if right or just)  embossed on the floor in the rotunda of this building, encourages devotion to such a pattern. Litigation guided by it makes the courthouse the temple of justice. When judges permit their emotions or the misapplication of legal principles to shunt them away from it, they must be reversed. The judge must above all be neutral and his neutrality should be of the tough variety that will not bend or break under stress. He may ask questions to clarify the issues but he should not lean to the prosecution or defense lest it appear that his neutrality is departing from center. The judge's neutrality should be such that even the defendant will feel that his trial was fair. In the trial of a capital case the judge's attitude or demeanor may speak louder than his words; in fact it may speak so loud that the jury cannot hear what he says. This is particularly true when his emotions instead of his judgment get in the driver's seat. We do not say that this was the case here, but when he repeatedly upholds the proffer of evidence relating to incidents at the Blue Grass Market over objections of defendant, and then admonishes counsel for defendant that if he again accused him of taking over the prosecution of defendant he would cite him for contempt, the imposition of such a hurdle was at least ground for counsel to think that his neutrality was veering entirely too far to the left of center.
It follows that the judgment appealed from must be reversed for a new trial because (1) the evidence in relation to the shooting at the Blue Grass Market far surpassed the grounds of relevancy as pointed out in Williams v. State, supra; (2) the rule governing conviction by circumstantial evidence was not met or complied with. If the evidence of the ballistic expert is sufficient to show that the .25 caliber pistol was used at both the Blue Grass Market and the H & K Market, the record is silent as to whose hands it was in when *489 used at the H & K Market. The fact that it changed hands several times and was pawned to appellant early in 1958 with nothing more in the record is not inconsistent with every reasonable hypothesis of innocence. Some account of it must be shown from the time it was alleged to have been pawned to appellant to the time it was alleged to have been used at the Blue Grass Market. (3) For the reasons pointed out, there was merit to the contention that the trial judge's attitude militated against a fair trial. Allen v. State, Fla. 1952, 62 So.2d 70; Diecidue v. State, Fla. 1961, 131 So.2d 7, and Leavine v. State, 109 Fla. 447, 147 So. 897.
Other questions raised have been examined but are not discussed.
Reversed for a new trial.
ROBERTS, C.J., and TERRELL, DREW, THORNAL, O'CONNELL and HOBSON (Ret.), JJ., concur.
THOMAS, J., agrees to conclusion.

ON REHEARING GRANTED
PER CURIAM.
Petition for rehearing on the part of the state urges that the opinion filed herein mistakenly contained the following language:
"One witness testified that he saw a `tall, dark, stout man' running away from the H & K Market soon after Kaplan was killed. Defendant did not answer to this description. There is no other direct evidence in this record that places defendant at or near the H & K Market when Kaplan was killed." (Emphasis supplied)
The phrase "tall, dark, stout man" appeared as a quotation in the appellant's brief. A re-examination of the record discloses that the only witness on this subject, George Gray, testified that the man he saw fleeing the H & K Market on the night of Kaplan's death was "about six feet or a little higher"; "he looked like a colored man," but Gray did not "know whether he was light or black"; and the fugitive "was not a big man" but rather weighed less than 200 pounds. Appellant's brief described Williams as a "light-colored, slender negro." The state did not contest this description.
The petition for rehearing is accordingly granted. The sentence containing the pharse, "tall, dark, stout man" and the two succeeding sentences quoted herein are stricken from the opinion. In all other respects the petition for rehearing is denied and the opinion as written and approved is adhered to and re-affirmed.
ROBERTS, C.J., and TERRELL, THOMAS, DREW, THORNAL, O'CONNELL and HOBSON (Retired), JJ., concur.