688 So.2d 301 (1996)
Joseph Nahume GREEN, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 83003.
Supreme Court of Florida.
November 27, 1996.
Rehearing Denied February 19, 1997.
*303 Nancy A. Daniels, Public Defender and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General and Curtis M. French, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Joseph Nahume Green, Jr. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We find that the trial court erred in two respects: allowing cross-examination of a defense witness's prior alcohol use; and admitting evidence seized pursuant to an overbroad warrant. After reviewing the entire record in this case, we are unable to find that these errors did not affect the jury's verdict beyond a reasonable doubt. Accordingly, we reverse and remand the case for a new trial.
The facts of this case follow. At about 10:10 p.m. on December 8, 1992, Judy Miscally drove to a Mapco convenience store in Starke, Florida, to use a public telephone. While standing in front of the telephone, she was approached by a man who demanded money. When she refused and screamed, the man told her to shut up. When she again screamed, he grabbed her and shot her. The man then fled the scene and Miscally died.
Four people witnessed the shooting: the victim, John Goolsby, Katrina Kintner, and Lonnie Thompson. The victim described the shooter only as a skinny black man in his mid-twenties and described the gun as small, semiautomatic pistol which looked like a "Glock." Goolsby, who was in his car at a stoplight when he heard the shot, saw two people in front of the Mapco. However, because he was not wearing his glasses, Goolsby could not determine either the sex or race of either person. Kintner was sitting in her car in the parking lot of a convenience store across the street from the Mapco when she heard the shot. From her car, Kintner saw three black men surrounding a white woman at the Mapco; however, she could not describe any of the people she saw in greater detail than that the woman was short with dark hair, and one of the men was taller than the other two. Although she was not looking at the Mapco when she heard the shot, when she looked up, Kintner saw two men running away from the store but did not see where the third one went.
The other eyewitness to the shooting was Lonnie Thompson. Like Kintner, Thompson was near the convenience store across the street from the Mapco, about two hundred and sixty feet away from Miscally. Thompson has an IQ of 67 and had previously suffered three head traumas which caused him headaches, dizziness, head spins, and reading and memory problems. Also, Thompson testified that while working for a steel company, he was hit in the right eye by a piece of steel. Before the shooting, Thompson had drunk eight sixteen-ounce cans of beer, and he ultimately drank at least twelve sixteen-ounce beers that night. When first asked by police if he saw anything, he denied that he did. Later that night, Thompson told police that he had seen a white male shoot Miscally. Finally, early the next morning, Thompson told police that he saw Green and Miscally struggle in front of the Mapco over Miscally's purse. He testified that during the struggle, Green held the purse in one hand and Miscally's wrist with *304 his other hand, and throughout the struggle he had a gun pointed at her. Additionally, Thompson testified that even though Green was wearing a trench coat which was buttoned, he could see that Green wore a holster on his hip. Thompson then testified he saw Green shoot Miscally and run behind the store.
Aside from Thompson's identification, there was no other physical evidence linking Green to the crime. The State attempted to bolster its case against Green by presenting circumstantial evidence that Green had the opportunity to kill Miscally.
In defense, Green presented Kintner's account of the murder and tried to rebut the State's case. Testimony showed that on the night of the murder, Green was walking around Starke with his girlfriend, Gwen Coleman. Coleman testified that sometime after 9 p.m., the two went to the back of a local bar, where they asked three men outside for money or cigarettes. She further testified that she and Green eventually walked from the bar to a Pizza Hut where Donald Laverly and David Padgett were trying to take the muffler off of Laverly's car. Green offered to help and retrieved a saw from his friend's house while Coleman returned to the motel where she and Green were staying. Green helped the men and then asked Laverly for money or cigarettes. After getting cigarettes, Green returned to the motel sometime after 11 p.m., when the motel owner saw Green outside and again reminded him that his rent was due the next day. Coleman's testimony about the time that they arrived at the Pizza Hut was essentially corroborated by testimony from Laverly and Padgett.
After a jury trial, Green was found guilty of the charge of first-degree murder. Thereafter, a penalty phase hearing was held, after which the jury recommended death by vote of nine to three. Weighing the aggravating factors[1] against the mitigating factors,[2] the trial court followed the recommendation and imposed the death penalty.
On appeal, Green raises twelve issues.[3] We agree with Green that the trial court erred with respect to issue 4, allowing the *305 State to cross-examine a defense witness about her prior alcohol abuse, and with respect to issue 8, admitting evidence seized pursuant to an overbroad warrant. Because we do not find beyond a reasonable doubt that these errors did not affect the guilty verdict, we reverse this case and remand for a new trial.
In issue 4, Green claims that the trial court erred when, over objection, it allowed the State to ask defense witness, Katrina Kintner, if she was a recovering alcoholic. Relying on Edwards v. State, 548 So.2d 656, 658 (Fla.1989), Green asserts that since there was no evidence presented that the witness drank on the night of the murder, the trial court should not have allowed this impeachment. We agree.
As noted above, Kintner testified for the defense that she saw three black men surrounding a white woman at the Mapco, and just after hearing the shots, she saw two men running back behind the dumpster but did not see where the third one went. At the end of direct examination, the defense asked Kintner if she had anything to drink that night, to which she responded "no." On cross-examination, the State asked if she had "previously been someone who drank alcoholic beverages." After the trial court overruled the defense objection, she answered that she was a recovering alcoholic for the past three years, and just prior to being in the parking lot at the convenience store on the night of the murder, she had been at an Alcoholics Anonymous meeting. On redirect, she stated that she had run the meeting and that this would not have been possible if she had been drinking.
Cross-examination of a witness is limited to the subject matter on direct examination and matters affecting the credibility of the witness. See § 90.612(2), Fla. Stat. (1993). Thus, as a general rule, the questions on cross-examination must be no more broad in scope than those on direct. See McCrae v. State, 395 So.2d 1145 (Fla.1980), cert. denied, 454 U.S. 1041, 102 S.Ct. 583, 70 L.Ed.2d 486 (1981). Here, the question on direct was limited to Kintner's drinking on the night of the murder. Asking the witness about her alcohol use at other times thus went beyond the permissible scope of cross-examination.
Moreover, we have previously held that evidence of drug use for impeachment purposes is inadmissible unless it is shown that: the witness was using the intoxicant[4] at or about the time of the incident about which the witness is testifying; the witness is using the intoxicant at or about the time of testimony; or it is expressly shown by other relevant evidence that the prior use of the intoxicant affects the witness's ability to observe, remember, and recount. Id. at 658. In this case, there was no showing that any of these bases for the introduction of this evidence existed prior to the questioning. Therefore, this questioning was error.
The State asserts that if error, in light of the rehabilitation on redirect and the prosecution not mentioning her prior alcoholism in closing arguments, this error was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986). In the absence of other error, we would agree. However, our review of the entire record in this case causes us to conclude that we must analyze the effect of this error with the effect of the error in admitting evidence pursuant to an invalid search warrant.
In issue 8, Green challenges the admission of the clothes he was wearing on the night of the murder, which were seized pursuant to a search warrant. The events giving rise to the issuance of the search warrant are as follows. The day after Thompson identified Green as the shooter, he described the clothing Green was wearing to officer William Reno. Later that day, Reno made several trips to the motel room where Green was staying with his girlfriend, Gwen Coleman. During one of these visits, Coleman let the officers into the room and pointed to the clothing Green wore the night before. Reno then went to the state attorney's office, *306 where an affidavit in support of a search warrant was drafted.
At the time the police executed the affidavit, they knew that Green was wearing a black, pinstriped suit, a white shirt, and a brown trench coat that night. Also, the police recovered a .32-caliber casing from the scene of the murder and had Miscally's description of the gun as a small, semi-automatic gun which looked like a Glock. However, the affidavit stated only that: an eyewitness to the crime both identified Green as the perpetrator and described his clothes; and Coleman pointed out Green's clothing to Reno, and the clothing matched the eyewitness's description.
The affidavit was taken to a judge, who issued a search warrant. This warrant authorized the police to search for "the clothing Joseph Nahume Green, Jr. was wearing the evening of the 8th day of December, 1992, the weapon used in the murder of Judith Miscalley and other evidence related to the fatal shooting." Thereafter, Reno returned to the motel for a third time and seized the clothing.
Green filed a motion to suppress the clothing at trial, which the trial court denied. He also renewed his objection to the admission of this evidence prior to its admission. On appeal, Green contends that the search warrant failed to describe the items to be seized with sufficient particularity and that therefore the evidence seized should be suppressed.
For a search warrant to be valid it must set forth with particularity the items to be seized. U.S. Const. amend. IV; Art. I, § 12, Fla. Const.; § 933.04, Fla. Stat. (1991). This particularity requirement makes general searches impossible and limits the executing officer's discretion when performing a search. See Carlton v. State, 449 So.2d 250 (Fla.1984). While this requirement must be given a reasonable interpretation consistent with the character of the property sought, id., when the purpose of the search is to find specific property, the warrant should particularly describe this property in order to preclude the possibility of the police seizing any other. See North v. State, 159 Fla. 854, 857, 32 So.2d 915, 917 (1947).
We find that in this case the warrant is facially overbroad. There was nothing in the warrant to assist the police in narrowing the scope of their search once they arrived at Green's hotel. Given the description of the clothing in the warrant, it was not possible for an officer to look at this warrant and decide with reasonable certainty which articles of clothing the officer was empowered to seize. This is not a case in which a broad description is permissible because the items to be seized are unique or otherwise distinguishable. Further, it is not relevant to this analysis that the officer who actually executed the warrant had information not contained in the warrant. As we found in Carlton, the language of the warrant should not be scrutinized or compared to the knowledge of the officer seeking the warrant. Carlton, 449 So.2d at 251. Because the search warrant's broad description of the items to be seized failed to rein in the officer's discretion when executing the search, we find the fruit of this search must be suppressed.
The State argues that even if the warrant is overbroad, the good-faith exception from United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), should apply. However, the facial invalidity of the warrant precludes the application of the exception. See id. at 923, 104 S.Ct. at 3420-21. This is so because the executing officers, relying on a warrant which fails to particularly describe the items to be seized, cannot reasonably presume the warrant to be valid. Id.; Sims v. State, 483 So.2d 81, 82-83 (Fla. 1st DCA 1986); State v. Ross, 471 So.2d 196 (Fla. 4th DCA), cert. denied, 474 U.S. 945, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985).
Nevertheless, the State argues that the admission of this evidence was harmless beyond a reasonable doubt because there was no dispute over what Green was wearing on the night of the murder. Green admitted prior to trial and Coleman testified at trial that Green was wearing the black pinstriped suit. However, we do not agree that this error was harmless.
*307 We have previously explained our harmless-error analysis as follows:
The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable probability that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.
State v. DiGuilio, 491 So.2d 1129, 1139 (Fla. 1986).
When these two errors are analyzed in light of the case presented against Green, we are unable to conclude beyond a reasonable doubt that these errors did not contribute to the outcome of the trial. Without any physical evidence linking Green to the crime, the State's case against him hinged primarily on Thompson's testimony. As detailed above, Thompson's testimony was often inconsistent and contradictory. For example, during his direct examination, Thompson identified Green's suit, which had been admitted into evidence. However, on cross-examination, Thompson admitted that in a statement given immediately after the murder he had said that the murderer was wearing clothes which were a different color than the suit in evidence. Also, he admitted that at a preliminary hearing two months after the murder he had testified that he could not remember what the murderer's clothing looked like. While the police were not able to obtain any forensic evidence from the suit linking Green to the crime, the introduction of this evidence bolstered Thompson's credibility. Having the suit introduced at trial and identified by Thompson as what he saw the murderer wearing at the time of the murder provided an inference of reality to Thompson's testimony which his words otherwise did not have.
Contrarily, the cross-examination of Kintner was an impermissible attack on her credibility. Allowing the State to inquire about her prior alcohol use placed a cloud on Kintner's rendition of the events. Because the case against Green hinged delicately and entirely on the credibility of the witnesses, we are unable to say beyond a reasonable doubt that these errors did not affect the verdict.
Accordingly, we reverse and remand this case for a new trial. Because we are reversing the conviction, we will not address any of the other issues raised by Green. However, because of the unique circumstances of this case, we direct that a retrial of this case be held in Alachua County.
It is so ordered.
SHAW, GRIMES, HARDING and WELLS, JJ., concur.
OVERTON, J., concurs with reversal.
ANSTEAD, J., concurs in result only.
KOGAN, C.J., concurs in part and dissents in part with an opinion.
KOGAN, Chief Justice, concurring in part and dissenting in part.
I agree that the conviction and sentence in this case should be reversed. Based on the record however, I conclude that Thompson, the only witness against Green, was incompetent to testify. Accordingly, I would remand to the trial court with directions to enter an order of acquittal.
NOTES
[1] The trial court found two aggravating factors: (1) Green was previously convicted of a felony involving the use or threat of violence to a person; and (2) the murder was committed while Green was engaged in the commission of or attempt to commit a robbery.
[2] The trial court found and weighed the following mitigating circumstances: Green's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, significant weight; Green was physically abused during childhood by his father, slight weight; Green suffers from some neuropsychological brain dysfunction, slight weight; Green came from an economically disadvantaged background which included a large family and being raised by a single parent, slight weight; Green rehabilitated himself by finding employment and by gaining the trust and confidence of his employers, significant weight; Green rehabilitated himself by overcoming drug addiction, weight; Green's prior second-degree murder conviction was not willful, weight. The trial court also instructed the jury on two other statutory mitigating factors: the crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance, and the defendant acted under extreme duress or under the substantial domination of another person. However, the court did not find these mitigators to exist.
[3] These issues are: (1) A fundamental injustice will occur if this court affirms Green's conviction and sentence; (2) the court erred in denying Green's motion for a new trial on the basis that the verdict was contrary to the weight of the evidence; (3) the State produced insufficient evidence to prove that Green premeditatedly killed Miscally; (4) the court erred in overruling Green's objection to the State's questions of his witness, Katrina Kintner, that she was a recovering alcoholic, as there was no evidence that she had drunk anything on the night of the murder; (5) the court erred in refusing to suppress Lonnie Thompson's identification of Green as the murderer; (6) the court erred in denying Green's motion for a change of venue; (7) the court erred in admitting as excited utterances statements of the victim after she had been shot; (8) the court erred in denying Green's motion to suppress evidence seized by authority of an insufficient warrant; (9) the court failed to conduct an adequate hearing to determine whether Lonnie Thompson was competent to testify; (10) the court erred in refusing to let Green argue residual doubt as to his guilt in the penalty phase; (11) the court erred in refusing to consider evidence that Green had taken a polygraph examination and shown no deception when asked about his involvement in the murder; and (12) the court erred in finding that Green committed the murder during the course of a robbery.
[4] In Edwards we addressed the issue in the context of drug use. However, for purposes of the analysis, we find no distinction between prior drug or alcohol use. See Charles W. Ehrhardt, Florida Evidence § 608.7 (1995 ed.).