14 So.3d 211 (2009)
Herman LINDSEY, Appellant,
v.
STATE of Florida, Appellee.
No. SC07-1167.
Supreme Court of Florida.
July 9, 2009.
*212 Carey Haughwout, Public Defender, and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
Herman Lindsey appeals from a conviction of first-degree murder and a sentence of death.[1] Because we find the evidence presented at trial legally insufficient to support the convictions, we reverse and direct that a judgment of acquittal be entered. See Ballard v. State, 923 So.2d 475 (Fla.2006).

I. FACTS AND PROCEDURAL HISTORY
The felony murder charge against Lindsey resulted from the shooting death of Joanne Mazollo, who was killed during the course of a pawn shop robbery on April 19, 1994. Ms. Mazollo's body was found in the back room of the Big Dollar pawn shop where she had worked as a clerk. The medical examiner concluded that Ms. Mazollo died from a single gunshot wound to the head and that her death was likely instantaneous. Twelve years later, in 2006, Lindsey was charged with the crime, adjudicated guilty, and sentenced to death.
The evidence presented at Lindsey's trial established that, between 8:00 and 8:30 on the morning of the murder, the owner of the pawn shop, Gerald Singer, went to Big Dollar to set up the store for the day. He spoke to Ms. Mazollo by phone around 9:30 a.m. that morning, as was his routine, and she let him know that she had arrived and everything was okay. Thereafter, around 10:30 a.m., Singer called the shop several times but Ms. Mazollo did not answer. Concerned, Singer got in his car and drove to Big Dollar, where he discovered her dead body slumped in a chair in the back room. Singer testified that between five and seven firearms were missing from the store and that the cash drawer he had filled that morning was empty. *213 Additionally, he stated there were around fifty individual envelopes of jewelry and a blue velvet Crown Royal bag containing jewelry missing from the safe in the back room.
In October 1995, Lindsey gave a taped statement to police, which was played for the jury, in which he implicated Ronnie LoRay[2] for the crime. He said that on the day of the robbery, LoRay came over to his house and was very upset. He said that LoRay said that "they" robbed a place and that he heard a shot but did not know if the woman was dead or not. Lindsey said LoRay had gold jewelry in his pockets, a few hundred dollars, and a gun. Lindsey admitted being in the store prior to the crime and pawning his Sega under a false name. He also admitted that he sometimes helped LoRay get rid of stolen merchandise. But he denied being involved in the robbery.
The prosecution also played portions of three separate phone conversations Lindsey made from prison. During one of those conversations, Lindsey claimed that he was home with his wife at the time of the crime. In a subsequent call to his mother, Lindsey stated that he was afraid that, because the police had LoRay's fingerprints, LoRay would try to get a deal with the police by implicating Lindsey. Lindsey said he needed to talk to LoRay and assure him that he would not betray him and to let him know he was not alone. He also stated that he believed that his ex-wife was going to implicate him for the crime.
Several witnesses who testified for the State presented evidence by which the State sought to establish Lindsey's guilt. First, Demeatres Gause ("Nikki"), Lindsey's ex-wife, testified that a few days before the murder, she went to Big Dollar with Lindsey and LoRay and that the clerk in the store greeted Lindsey as if she knew him. She further testified that, on the morning of the murder, Lindsey was not in the apartment where she sometimes stayed with him when she awoke between 10:30 and 11:00 a.m., although she admitted he could have been downstairs. Then later, sometime before noon, Lindsey and LoRay arrived at the apartment together, just before the story of the Big Dollar robbery and Ms. Mazollo's murder appeared on the twelve o'clock news. Nikki noted that Lindsey asked her to turn up the volume on the news report.
At some point later, Nikki discovered a Crown Royal bag containing jewelry in a closet in the apartment, and she indicated that it had not been there before.[3] Nikki also admitted that several other people lived at the apartment where she only "sometimes" stayed with Lindsey, including Ronnie LoRay, a girl named Marvet, and Marvet's children. But she said that Lindsey eventually sold the jewelry at a flea market, that she never asked him about the jewelry, and that Lindsey never told her anything about it or the murder and robbery of the pawn shop.
Next, Alfonzer Harrold, described as a very close friend of Nikki's, testified that he occasionally hung out with Lindsey and LoRay and that the three of them went to Big Dollar pawn shop the day before the *214 murder. Harrold said they were looking around as if they were going to buy something. At first, there was a woman working there alone but then a man came out of the back room so they all left a few minutes later. The next day, LoRay and Lindsey came over to Harrold's house, and Harrold noticed that LoRay was wearing a new bracelet. Harrold said he later told the police what he knew because he hoped to receive a $1,000 reward that he could use to buy cocaine.
Mark Simms also testified for the State about some comments Lindsey made to him. Simms stated that he met Lindsey in jail on May 20, 1994, about a month after the crime at Big Dollar. A few days later, the two men had a "macho" conversation about robberies. Simms admitted to Lindsey that he was involved in a robbery where someone got shot but not killed. Lindsey replied that Simms should have handled the situation better and that Simms should have killed the person because he saw Simms's face. Lindsey also told Simms that he had to do that once. Lindsey said he had to kill someone. Simms admitted he had no idea what Lindsey was talking about at the time.
Other evidence revealed that LoRay's fingerprint was found on a stun gun box that was located in the back room of Big Dollar pawn shop next to the safe. And Lindsey's thumbprint was recovered from a pawn slip dated March 31, 1994, under the name of David Ashley, the name Lindsey used to pawn his Sega.
At the conclusion of the presentation of the evidence, Lindsey moved for judgment of acquittal, contending that the evidence was insufficient for a conviction and that the State failed to prove its case. The trial court denied the motion.

II. ISSUES ON APPEAL
On appeal, Lindsey raises eighteen issues: (1) the trial court erred in admitting irrelevant testimony; (2) the trial court erred in denying Lindsey's motion for judgment of acquittal; (3) the trial court erred in allowing a witness to testify that the victim knew Lindsey; (4) the trial court erred in allowing the State to redact a portion of Lindsey's statements; (5) the trial court erred in admitting evidence that Lindsey had been in jail; (6) the trial court erred in denying Lindsey's motion to dismiss the indictment; (7) the trial court erred in admitting an autopsy photo into evidence; (8) the trial court erred in sending unrequested evidence to the jury; (9) the trial court erred in denying Lindsey's request for a new trial; (10) the trial court erred in finding the avoid arrest aggravator; (11) the trial court erred in denying Lindsey's request for a special jury instruction; (12) the trial court erred in instructing the jury on the avoid arrest aggravator; (13) the death sentence is not proportionate to the crime; (14) the trial court erred in allowing the prosecution to question Lindsey about guilt phase issues during the penalty phase; (15) the trial court erred in allowing the prosecution to impeach Curtis Fox; (16) the trial court erred in giving great weight to the jury's recommendation of the death sentence; (17) Florida's death penalty law is unconstitutional; and (18) Florida's felony murder aggravator is unconstitutional.
Because we find that the trial court erred in denying Lindsey's motion for a judgment of acquittal, we do not address the other issues.

III. ANALYSIS
Preliminarily, we note that this case is based completely on circumstantial evidence. And, "where a conviction is based wholly upon circumstantial evidence, a special standard of review applies." Reynolds v. State, 934 So.2d 1128, 1145 *215 (Fla.2006) (quoting Darling v. State, 808 So.2d 145, 155 (Fla.2002)). The special standard requires that the circumstances lead "to a reasonable and moral certainty that the accused and no one else committed the offense charged. It is not sufficient that the facts create a strong probability of, and be consistent with, guilt. They must be inconsistent with innocence." Frank v. State, 121 Fla. 53, 163 So. 223, 223 (1935). And, in order for the facts to be "consistent with the defendant's guilt," the State must establish every element of the offense. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). As this Court has explained,
[e]vidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, it is not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence.
Ballard, 923 So.2d at 482 (quoting Davis v. State, 90 So.2d 629, 631-32 (Fla.1956)). And, "[a]lthough the jury is the trier of fact, a conviction of guilt must be reversed on appeal if it is not supported by competent, substantial evidence." Id. (quoting Crain v. State, 894 So.2d 59, 71 (Fla.2004)).
In Ballard, we held that it is the duty of "the courts to ensure that the State is held to its burden of proof when someone is charged with a serious crime and liberty and life are at risk.... [When a] case is purely circumstantial, we must determine whether competent evidence is present to support an inference of guilt `to the exclusion of all other inferences.'" Id. at 485 (quoting Crain, 894 So.2d at 71). In Ballard, investigators determined that one of the four fingerprints found on the bed frame near the victim's upper torso belonged to the defendant. Id. at 478. In addition, a forensic scientist determined that one of several hairs found in the hand of the victim was consistent with the arm hair of Ballard; but he was unable to determine whether Ballard's arm hair had fallen out naturally or if it had been forcibly removed. Id. at 479-80. At the close of the State's evidence, "Ballard moved for a judgment of acquittal, contending that there was a reasonable hypothesis of innocence in that the only evidence that linked Ballard to the case [was] equally consistent with the fact that he was often a guest in [the victims'] apartment." Id. at 481. This Court agreed. It stated:
In capital cases, this Court has recognized that it has a fundamental obligation to ascertain whether the State has presented sufficient evidence to support a conviction. Ballard contends that although the State proved that [the victims] were robbed and killed, and one of his hairs and fingerprints was in the apartment, the State failed to prove that Ballard was the perpetrator of those crimes.
Id. at 482.
We find that the present case is controlled by Ballard in that the State's evidence, while perhaps sufficient to create some suspicion, is simply not sufficient to support a conviction. The entire circumstantial case against Lindsey consists of the following evidence: (1) a Crown Royal bag containing jewelry was taken during *216 the robbery of Big Dollar pawn shop; (2) Nikki found a Crown Royal bag containing jewelry in a closet of an apartment where she sometimes stayed with Lindsey and several other individuals, including LoRay; (2) Lindsey eventually sold the jewelry from the bag in the closet at a flea market; (3) Lindsey told Simms that Simms should always kill witnesses to crimes and that Lindsey had to do that. No evidence shows that the bag of jewelry Nikki found in the closet is the same bag of jewelry that was missing from the pawn shop safe. In addition, no evidence shows that Lindsey placed the bag in the closet or that he ever had possession of it before he sold the items at a flea market. Furthermore, while we specifically decline to address whether Simms's testimony was even admissible on relevancy grounds, we nevertheless find that there is nothing in Lindsey's statements to Simms that, when combined with all the other evidence, is sufficient to convict him for the murder of Ms. Mazollo.
The State established that Lindsey made several visits to the pawn shop prior to the murder and that Ms. Mazollo appeared to know him. Yet, the State failed to produce any evidence in this case placing Lindsey at the scene of the crime at the time of the murder. Even if Lindsey was not home at the time the crime occurred, it does not mean that he was out robbing the Big Dollar pawn shop or killing Ms. Mazollo. Indeed, we find that the evidence here is equally consistent with a reasonable hypothesis of innocence. Even if the State had proved that the bag of jewelry Nikki discovered was the same bag of jewelry missing from the pawn shop, it would not be dispositive here because LoRay, as well as several other people, had access to the closet where Nikki discovered the bag containing jewelry; and Lindsey admitted that he sometimes helped LoRay get rid of stolen merchandise.
Consequently, we find that the evidence presented to support an inference of guilt does not exclude all other inferences. While we agree that the evidence here does seem suspicious, even a "deep suspicion the appellant committed the crime charged is not sufficient to sustain conviction." Williams v. State, 143 So.2d 484, 488 (Fla.1962); see also Ballard, 923 So.2d at 482 ("Suspicions alone cannot satisfy the State's burden of proving guilt beyond a reasonable doubt....").

IV. CONCLUSION
Accordingly, we conclude that the evidence here is insufficient to support Lindsey's conviction. Therefore, we reverse and vacate the conviction and sentence and remand with directions that a judgment of acquittal be entered.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
QUINCE, C.J., concurs with an opinion, in which PARIENTE and PERRY, JJ., concur.
QUINCE, C.J., concurring.
I concur in the majority's decision that the evidence is insufficient to support Lindsey's conviction, but write separately because I find the State's line of questioning of Lindsey during the penalty phase improperly exceeded the scope of cross-examination and that the trial court erred in allowing the prosecution to question Lindsey about guilt phase issues.
During the penalty phase, Lindsey took the stand and testified during direct examination solely about his family and childhood. Then, on cross-examination, the *217 prosecution began by asking, "Mr. Lindsey, tell me about the first time you met the lady at the pawn shop." Defense counsel timely objected, and a sidebar conference ensued. At sidebar, the State argued that the defense brought in the guilt phase because it had presented witnesses during the penalty phase to attack the credibility of State witness Mark Simms. The court ruled: "What's good, as they say, for the gander. Going to, of course, the aggravating circumstances. You can't go into every last thing, but going into the aggravating circumstances, those specifically relating to the Simms' issues. Overruled."
Thereafter, the prosecution continued to question Lindsey about Joanne Mazollo and the pawn shop:

Prosecutor: Tell me about the first time you met the lady at the pawn shop.

Lindsey: I don't remember.

Prosecutor: Okay. You don't remember going in and pawning something under the name of David Ashley?

Lindsey: Yes, I do remember that.

Prosecutor: And you don't remember the lady who was there?

Lindsey: Not right off hand, no.

Prosecutor: When we heard your ex-wife Nikki testify that she was in the pawn shop with you a couple of days before the murder, and you and the woman greeted each other, because you knew each other, tell me about that.

Lindsey: She said that when I came in it was like we knew each other. Any place I go, I always show respect for the person that's there.

Prosecutor: So you were there, met the lady that day. Tell me what you remember about it.

Lindsey: I'm not saying I was there that particular day. I'm just saying, when I go into places, I'd be respectful of people.

Prosecutor: Okay. How about the day before the murder?

Lindsey: I don't recall.

Prosecutor: Do you recall when you went back in there with Ronnie LoRay and Alfonzer Harrold?

Lindsey: I don't recall that.

Prosecutor: You don't remember that?

Lindsey: No, I don't remember that.

Prosecutor: She was seated in a chair. She didn't resist you, did she?

Defense: Objection. Argumentative.

Court: Sustained.

Prosecutor: Why did you put a gun to her head and pull the trigger?

Lindsey: I didn't.

Defense: Objection, Your Honor, goes to

Prosecutor: Goes to why he did it.

Defense: what we said at sidebar.

Court: Overruled.

Prosecutor: Why did you do that?

Lindsey: I didn't.

Prosecutor: So the jury is wrong?

Lindsey: I think the jury is mistaken.
Section 90.612(2), Florida Statutes (2006), provides:
Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in its discretion, permit inquiry into additional matters.
"Thus, as a general rule, the questions on cross-examination must be no more broad in scope than those on direct." Green v. State, 688 So.2d 301, 305 (Fla.1996) (holding that it was error to allow questions on cross-examination related to a witness's prior use of alcohol when questions on direct were limited to use of alcohol on the *218 night of the murder); Salas v. State, 972 So.2d 941, 956 (Fla. 5th DCA 2007) ("[C]ross examination must relate to credibility of the witness or be germane to the matters brought out on direct examination.") (citing Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982)). These rules regarding cross-examination apply to all witnesses, including a defendant who takes the witness stand as Lindsey did in this case.
This Court has also defined the permissible scope of cross-examination as follows:
When the direct examination opens a general subject, the cross-examination may go into any phase, and may not be restricted to mere parts ... or to the specific facts developed by the direct examination. Cross-examination should always be allowed relative to the details of an event or transaction a portion only of which has been testified to on direct examination. As has been stated, cross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief.
Zerquera v. State, 549 So.2d 189, 192 (Fla. 1989) (quoting Coxwell v. State, 361 So.2d 148, 151 (Fla.1978)). And if a party wishes to elicit testimony on cross-examination that goes beyond what has been testified to in the direct examination, he must make the witness his own. Steinhorst, 412 So.2d at 337. To be clear, a party cannot use cross-examination as a vehicle for presenting evidence. Id.
Here, the prosecution's questioning of Lindsey greatly exceeded the allowable scope of cross-examination. Lindsey never broached the subject of Mazollo or the pawn shop murder during his direct examination. Rather, Lindsey's testimony on direct was limited solely to his childhood and his relationship with his family. The prosecutor's entire questioning of Lindsey on cross-examination regarding Mazollo (i.e., how Lindsey knew the woman at the pawn shop; the fact that the woman was seated and did not resist Lindsey; why Lindsey put the gun to the woman's head and pulled the trigger) had nothing to do with Lindsey's relationship with his family or his childhood.
Thus, the trial court abused its discretion in allowing the prosecution to exceed the scope of direct during its cross-examination of Lindsey during the penalty phase. See Salas, 972 So.2d at 956 ("An appellate court reviews a trial court's ruling concerning the scope of cross-examination for an abuse of discretion."). I conclude that this error was not harmless. The prosecution's comments were not only improper, but were also prejudicial and made with the apparent goal of inflaming the jury. Therefore, it cannot be concluded that these comments did not affect the jury's decision to impose the death penalty. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
PARIENTE and PERRY, JJ., concur.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
[2] LoRay is currently incarcerated for second-degree murder for the death of Ms. Mazollo and the robbery of Big Dollar pawn shop. LoRay was arrested in December 2005, a few months before Lindsey was charged.
[3] Although the State contended in its opening argument that Nikki would testify that Lindsey and LoRay came into the apartment on the morning of the robbery and murder carrying bags of jewelry, her actual testimony at trial was that she saw a Crown Royal bag of jewelry in a closet at some later date.