# Third District Court of Appeal

## State of Florida

Opinion filed May 1, 2019.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-2815
Lower Tribunal No. 14-22311
_____

**John Garcia,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Stephen T. Millan, Judge.

Carlos J. Martinez, Public Defender, and Susan S. Lerner, Assistant Public Defender, for appellant.

Ashley Moody, Attorney General, and Jeffrey R. Geldens, Assistant Attorney General, for appellee.

Before EMAS, C.J., and SCALES and HENDON,[1] JJ.

SCALES, J.

---

[1] Judge Hendon did not participate in oral argument.

John Garcia appeals his convictions and sentences for second-degree murder and second-degree grand theft. Because we conclude that, at trial, the State presented competent, substantial evidence that the value of the property Garcia stole from the victim, Larissa Macriello, was only $1,000, we reduce Mr. Garcia's conviction for second-degree grand theft to third-degree grand theft and remand to the lower court for resentencing. With regard to Mr. Garcia's conviction for second-degree murder, the State presented purely circumstantial evidence that Ms. Macriello was deceased and that she died through the criminal agency of Mr. Garcia. Therefore, because we conclude that the State failed to adduce sufficient, competent evidence to rebut Mr. Garcia's reasonable hypothesis of innocence, we also reverse Mr. Garcia's conviction for second-degree murder and remand to the lower court with directions to enter an order of acquittal on this charge.

## I. RELEVANT FACTS AND PROCEDURAL BACKGROUND

In 1999, Larissa Macriello relocated to the United States from Panama. Over the years, she lived in Rhode Island, Maryland, North Carolina and Florida. In the summer of 2009, Ms. Macriello moved to Jacksonville Beach, Florida to live with her brother, Roderik Mokillo. In early 2011, she moved to Miami. In early June 2013, Ms. Macriello disappeared suddenly and without a trace.

Ms. Macriello was close to her family, staying in frequent contact with her mother and siblings via telephone, email, text message and social media. She last

2

communicated with her brother, Mr. Mokillo, via text message in late May of 2013, over Memorial Day weekend. She last spoke to her mother on the telephone on June 1, 2013.

Ms. Macriello's landlord last saw and spoke to Ms. Macriello on June 3, 2013. Ms. Macriello told the landlord that she was waiting for her passport to arrive so that she could return to Panama to visit her mother. On June 10, 2013, between noon and 2 p.m., the landlord heard Ms. Macriello's car being parked in her usual parking spot in front of her apartment building. The landlord did not, however, see the individual who drove the car. That same day, June 10, 2013, around noon, a taxi driver picked up the defendant, John Garcia, and an unknown woman (not Ms. Macriello) from a convenience store located several blocks from Ms. Macriello's residence.

After Ms. Macriello failed to respond to text messages, or to answer or return telephone calls, Mr. Mokillo traveled to Miami on June 18, 2013 to file a missing person report. That same day, with the assistance of the landlord, officers from the Miami-Dade County Police Department ("MDPD") gained access to Ms. Macriello's apartment to conduct a check on Ms. Macriello's welfare. Ms. Macriello was not inside the apartment. The police walk-through of the apartment revealed no signs of a struggle, and nothing out of the ordinary. The police did not see her purse, laptop computer, cellphone or car keys in the apartment; these items

3

were never found. The officers observed Ms. Macriello's car in the parking space outside the apartment building, but did not search it once it was clear that Ms. Macriello was not inside it. The officers' subsequent calls to hospitals and jails in Miami-Dade County and Broward County revealed no information on Ms. Macriello's whereabouts.

Ms. Macriello had checking and savings accounts with Bank of America ("BOA"). Although Ms. Macriello's brother, Mr. Mokillo, was not an authorized user on the BOA accounts, he was listed as the beneficiary on the accounts. Mr. Mokillo visited a BOA bank branch and was able to learn, generally, that withdrawals were being made out of her accounts in large amounts. Mr. Mokillo relayed this information to the police, who subpoenaed Ms. Macriello's BOA account records.

The BOA account records revealed that, around the date of Ms. Macriello's disappearance (June 3, 2013), there was approximately $24,000 in her BOA checking account and $23,000 in her BOA savings account. Beginning on June 5, 2013 and going through August 15, 2013, however, the bulk of her BOA account balances was drained through a series of transactions, all to the benefit of Mr. Garcia – specifically: (i) on June 5 and 12, 2013, Mr. Garcia made two ATM withdrawals from Ms. Macriello's BOA savings account,[2] using her ATM card and

---

[2] BOA surveillance video and still pictures from the BOA ATM evidenced Mr. Garcia making the two ATM withdrawals, the first of which Mr. Garcia made at a

4

personal identification number ("PIN"); (ii) Mr. Garcia deposited two $20,000 personal checks (dated June 5 and 10, 2013, respectively), written by Ms. Macriello to Mr. Garcia, into his own BOA checking account; and (iii) multiple online transfers were made from Ms. Macriello's BOA checking account to Mr. Garcia's BOA checking account totaling $4,700.[3]

The police subpoenaed the cellphone records for Ms. Macriello's and Mr. Garcia's cellular accounts, learning that there were frequent calls between Mr. Garcia's and Ms. Macriello's cellphones between the time Ms. Macriello was last seen (June 3, 2013) and when her cellphone was shut off (July 7, 2013). Other than calling voicemail, Ms. Macriello's cellphone made no outgoing calls to anyone other than Mr. Garcia. Moreover, during this timeframe, numerous calls between Mr. Garcia's cellphone and Ms. Macriello's cellphone "pinged" off the same cellular antenna, within the same sector, indicating that the cellphones were within close proximity to each other at the time of the calls.

When MDPD crime scene investigators ("CSI") processed and inspected Ms. Macriello's vehicle, they found that her car was unlocked, smelled of cleaning agents, and was thoroughly clean inside. The driver's seat was positioned further

---

BOA drive-up ATM while driving Ms. Macriello's vehicle.

[3] The BOA records custodian testified that the following online transfers were made: $1,000 on June 5, 2013; $1,000 on June 26, 2013; $1,000 on July 5, 2013; $1,000 on July 17, 2013; and $700 on August 5, 2013.

back to accommodate a driver taller than Ms. Macriello. CSI sprayed the interior of the vehicle with luminol, which reacts to hemoglobin in blood. The luminol reacted to a fluid in the trunk (possibly detecting the outline of a purse) and to a fluid on the front passenger floorboard (possibly detecting the outline of a hammer). The affected area was removed and tested, but the results came back negative for blood. CSI found two strands of Mr. Garcia's hair in the vehicle interior, and one DNA sample matching Mr. Garcia on the car's center console.

In October 2014, Mr. Garcia voluntarily went to the police station to discuss Ms. Macriello's disappearance with an MDPD homicide detective. In the interview, Mr. Garcia stated that he met Ms. Macriello on a dating website. He admitted to having an ongoing sexual relationship with Ms. Macriello, but denied ever paying her for sex. Mr. Garcia's wife did not know Ms. Macriello or that Mr. Garcia had a relationship with her. Mr. Garcia claimed that he had last seen Ms. Macriello sometime between July 4 and August 2013.

Mr. Garcia told the MDPD homicide detective that he had lent money to Ms. Macriello on occasion; but, Mr. Garcia did not tell the detective about a specific loan to Ms. Macriello where she had executed a promissory note memorializing a $20,000 loan from him. Mr. Garcia denied having any access to, or taking any money from, Ms. Macriello's BOA accounts. Mr. Garcia also told the detective that he had only ever been in Ms. Macriello's car as a passenger.

During the taped police interview, Mr. Garcia's wife confronted him. Mr. Garcia told his wife that he and Ms. Macriello were just friends, and he denied that he ever had sex with Ms. Macriello. Mr. Garcia initially denied receiving any money from Ms. Macriello, but later admitted to his wife that Ms. Macriello had given him two $20,000 checks because Ms. Macriello owed him money.[4] Mr. Garcia told his wife that he did not kill Ms. Macriello and that Ms. Macriello would show up some day. The police arrested Mr. Garcia that same day.

The State charged Mr. Garcia by information with the first-degree premeditated murder of Ms. Macriello, and one count of second-degree grand theft. A Florida grand jury also indicted Mr. Garcia on these charges.[5] The case went to trial in November 2015.

At trial, the State theorized that, on June 4, 2013, Mr. Garcia killed Ms. Macriello in order to steal the money in her BOA savings and checking accounts.

---

[4] A warranted search of Mr. Garcia's home revealed a handwritten promissory note, purportedly in Ms. Macriello's handwriting, that was found in the back of a filing cabinet drawer. This note purported to evidence that Mr. Garcia had lent Ms. Macriello $20,000.

[5] The State also charged Mr. Garcia with, and indicted him for, two counts of possession of a firearm by a convicted felon. These two counts were eventually severed and Mr. Garcia pled guilty to both counts, reserving his right to challenge the legality of the search on appeal. The trial court sentenced Mr. Garcia to fifteen years in prison on each count of possession of a firearm by a convicted felon, to run consecutively. The trial court later vacated one of the firearm possession sentences. In appellate case number 3D15-2236, this Court affirmed Mr. Garcia's conviction for one count of possession of a firearm and the fifteen-year sentence thereon. See Garcia v. State, 225 So. 3d 820 (Fla. 3d DCA 2017).

At the close of the State's case, the defense moved for a judgment of acquittal. As to the charge of first-degree premeditated murder, defense counsel argued that the State had failed to provide sufficient evidence that Ms. Macriello was dead, or, in the alternative, that Mr. Garcia was the one who killed her. As to the charge of second-degree grand theft, defense counsel argued that the State had failed to prove that Mr. Garcia stole the money from Ms. Macriello's BOA accounts. The trial court denied the motion for judgment of acquittal.

The jury found Mr. Garcia guilty of second-degree murder, a lesser included offense of first-degree premeditated murder. The jury also found Mr. Garcia guilty of second-degree grand theft, finding that the value of the stolen property was "$20,000 or more but less than $100,000." The trial court sentenced Mr. Garcia to life in prison for second-degree murder and fifteen years in prison for second-degree grand theft, to run consecutively. This appeal ensued.

**II. STANDARD OF REVIEW**

In reviewing an order denying a motion for judgment of acquittal, our standard of review is *de novo*, whereby this Court reviews the evidence presented below to determine whether, as a matter of law, the evidence is legally adequate to sustain the defendant's conviction. See Johnston v. State, 863 So. 2d 271, 283 (Fla. 2003). In general, this Court will not reverse a conviction that is supported by competent, substantial evidence. Id. "There is sufficient evidence to sustain a

8

conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt." Id. In moving for a judgment of acquittal, the defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonable infer from the evidence." Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974).

Where the State's *proof of guilt* is wholly circumstantial,[6] however, this Court employs a "special standard of review" of the evidence presented at trial. See Knight v. State, 186 So. 3d 1005, 1010 (Fla. 2016) ("[I]n determining whether the circumstantial evidence standard applies, the relevant evidence is that which points to the defendant as the perpetrator. Courts should ask whether the evidence *of that particular defendant's guilt* is entirely circumstantial, not whether all of the State's evidence of the crime is circumstantial."); Hodgkins v. State, 175 So. 3d 741, 746 (Fla. 2015); Lindsey v. State, 14 So. 3d 211, 214 (Fla. 2009). Specifically, we must review the circumstantial evidence, in the light most favorable to the State, to determine whether the State presented competent evidence from which the jury could infer the defendant's guilt for the crime

---

[6] "Direct evidence is evidence which requires only the inference that what the witness said is true to prove a material fact." Kocaker v. State, 119 So. 3d 1214, 1224 (Fla. 2013) (quoting Charles W. Ehrhardt, Ehrhardt's Florida Evidence § 401.1 (2012 ed.)). "Circumstantial evidence is evidence which involves an additional inference to prove the material fact." Id.

9

charged to the exclusion of all reasonable hypotheses of innocence. See Hodgkins, 175 So. 3d at 746; Crain v. State, 894 So. 2d 59, 71 (Fla. 2004); Scott v. State, 581 So. 2d 887, 893 (Fla. 1991) (recognizing that the circumstantial evidence "must be of a conclusive nature and tendency, leading on the whole to a reasonable and moral certainty that the accused and no one else committed the offense charged" (quoting Hall v. State, 107 So. 246, 247 (Fla. 1925))). We must assess the record for its sufficiency, not its weight. See Crain, 894 So. 2d at 71.

Under this special standard of review, the State "is not required to 'rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." State v. Law, 559 So. 2d 187, 189 (Fla. 1989) (quoting State v. Allen, 335 So. 2d 823, 826 (Fla. 1976)) (footnote omitted); see Johnston, 863 So. 2d at 283. "Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt." Johnston, 863 So. 2d at 283. If the State fails to meet its threshold burden, the defendant must be acquitted of the underlying charge. See Hodgkins, 175 So. 3d at 746; Lindsey, 14 So. 3d at 215; Ballard v. State, 923 So. 2d 475, 482 (Fla. 2006) ("If the State's evidence is not inconsistent with the defendant's hypothesis of innocence, then no jury could return a verdict in favor of the State.").

**III. ANALYSIS**

1. <u>Grand Theft</u>

Section 812.014(1) of the Florida Statutes (2013), Florida's theft statute, provides:

> (1) A person commits theft if he or she knowingly obtains or uses,[7] or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
> (a) Deprive the other person of a right to the property or a benefit from the property.
> (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

In moving for a judgment of acquittal on the grand theft charge, defense counsel argued that the State had failed to present competent, substantial evidence that Mr. Garcia stole any of the money from Ms. Macriello's BOA checking and savings accounts, be it through his depositing the two $20,000 personal checks, the series of online transfers totaling $4,700, or his making the two $500 ATM withdrawals. We agree in part and disagree in part.

---

[7] Section 812.012(3) of the Florida Statutes (2013) defines "obtains or uses" as any manner of:

> (a) Taking or exercising control over property.
> (b) Making any unauthorized use, disposition, or transfer of property.
> (c) Obtaining property by fraud, willful misrepresentation of a future act, or false promise.
> (d)1. Conduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception; or
> 2. Other conduct similar in nature.

### a. The two $20,000 personal checks from Ms. Macriello to Mr. Garcia

The State posited below that Mr. Garcia had somehow coerced Ms. Macriello into writing and signing the two $20,000 personal checks by placing her under duress. The State, however, presented no evidence to support its coercion theory.[8]

The State's forensic document examiner testified that she compared BOA machine copies of the two personal checks to known handwriting samples of Ms. Macriello. Based on her comparisons, the forensic document examiner opined that the two checks were "probably written by Larissa D. Macriello." The memo line of the check dated June 5, 2013, read "Repay Loan #1." The memo line of the check dated June 10, 2013, read "#2."

The forensic document examiner also testified that she examined the original, handwritten promissory note purportedly evidencing that Ms. Macriello owed $20,000 to Mr. Garcia. Based on her comparison of the promissory note to Ms. Macriello's known handwriting samples, the forensic document examiner testified that she was "able to identify Larissa D. Macriello as the writer of that note." When asked by the State whether the forensic document examiner was able to determine whether a document was "written freely," "under duress," or "under

---

[8] Notably, the State did not argue this theory to the jury during closing argument.

any kind of pressure," the forensic document examiner answered each time, unequivocally, "No."

The State presented no evidence that Mr. Garcia made the June 5, 2013 online transfer[9] of $20,000 from Ms. Macriello's BOA savings account to her BOA checking account, or that Mr. Garcia somehow coerced Ms. Macriello into writing the two $20,000 personal checks or the promissory note. Thus, the State failed to present competent, substantial evidence that Mr. Garcia knowingly obtained Ms. Macriello's property ($40,000) with the specific intent either to deprive Ms. Macriello of her right to the property or to appropriate the property to his own use. See § 812.014(1), Fla. Stat. (2013). This, however, does not end our inquiry as the State provided other evidence that Mr. Garcia committed grand theft in this case.

*b. The $4,700 in online transfers from Ms. Macriello's BOA checking account*

The State maintained below that Mr. Garcia stole money from Ms. Macriello's BOA checking account by making the numerous online transfers (between June 5, 2013 and August 15, 2013) from Ms. Macriello's BOA checking account to Mr. Garcia's BOA checking account. The State, however, presented no evidence at trial to support this theory.

---

[9] See section III(1)(b), *infra*.

BOA's records custodian testified that BOA has the capability of determining where an online transfer originates from – i.e., the geographic location and the specific computer – by looking at the internet protocol ("IP") address associated with a particular online transaction. To the BOA records custodian's knowledge, however, MDPD never made an IP address request for the subject online transactions.[10] Because BOA did not process such a search request, the IP address(es) for the online transactions are unknown.

The State presented no evidence that Mr. Garcia ever possessed, or had access to, Ms. Macriello's laptop computer, or that Ms. Macriello stored the username and password for her BOA accounts on the laptop computer. MDPD never recovered Ms. Macriello's laptop computer after her disappearance. The State also presented no evidence that Mr. Garcia had learned Ms. Macriello's username and password through other means,[11] nor did the State adduce any evidence of Mr. Garcia's use of his own personal computer with respect to the subject online transactions. In short, there was no evidence presented to the jury that the online transfers were initiated by Mr. Garcia.

_____

[10] The MDPD homicide detective testified that the IP addresses for the subject online transactions were subpoenaed from BOA, but BOA never complied with the subpoena.

[11] We note that Mr. Garcia's possession of Ms. Macriello's ATM card and PIN did not establish that Mr. Garcia knew the username or password for Ms. Macriello's BOA accounts.

Given this lack of evidence, the State was unable to posit to the jury any explanation for how Mr. Garcia allegedly accomplished the online transactions in this case. Indeed, during the State's closing argument, the prosecutor commented:

> Now, we all know you have to have security codes to do these kinds of transfers. He got Larissa's security code somehow. I can't tell you how. I can't tell you how. Even her family didn't have them. Even her family didn't have them. He got them somehow.

Thus, the State failed to present competent, substantial evidence that Mr. Garcia knowingly obtained, through online banking transactions, Ms. Macriello's property ($4,700) with the specific intent either to deprive Ms. Macriello of her right to the property or to appropriate the property to his own use.[12]  See § 812.014(1), Fla. Stat. (2013). This leaves the evidence that Mr. Garcia committed grand theft by making the two $500 ATM withdrawals.

*c. The two $500 ATM withdrawals from Ms. Macriello's BOA savings account*

Ms. Macriello's brother, Roderick Mokillo, testified that Ms. Macriello did not give anyone access to her BOA accounts. The BOA records custodian testified

---

[12] We are cognizant that theft can be charged where there is a knowing and intentional possession of recently stolen property. See §812.014(1), Fla. Stat. (2013); §812.022(2), Fla. Stat. (2013); Smith v. State, 742 So. 2d 352, 354-55 (Fla. 5th DCA 1999). The State, however, did not charge or indict Mr. Garcia in this manner, nor was the jury instructed thereon. Moreover, while the State established that Mr. Garcia was in possession of Ms. Macriello's property ($4,700) – i.e., the funds were transferred into Mr. Garcia's BOA account – the State failed to present evidence that the property was stolen from Ms. Macriello.

15

that Ms. Macriello was the only legal signer on her BOA savings account. The State introduced, through the BOA records custodian, surveillance video, still pictures and transaction records evidencing that: (i) on June 5, 2013, at 3:56 p.m., while driving Ms. Macriello's vehicle, Mr. Garcia used Ms. Macriello's ATM card and PIN to withdraw $500 from her BOA savings account at a BOA drive-up ATM located in Brownsville; and (ii) on June 12, 2013, at 4:05 p.m., Mr. Garcia used Ms. Macriello's ATM card and PIN to withdraw $500 from her BOA savings account at a BOA walk-up ATM located in North Miami Beach.

The State presented direct evidence[13] that Mr. Garcia had knowingly obtained Ms. Macriello's property – i.e., the $1,000 he withdrew from the BOA ATMs. Notwithstanding this direct evidence, Mr. Garcia argues that the State failed to present any evidence to prove that he had the requisite specific intent either to deprive Ms. Macriello of her property or to appropriate the property to his own use. See § 812.014(1), Fla. Stat. (2013); Benitez v. State, 852 So. 2d 386, 388 (Fla. 3d DCA 2003) ("Grand theft requires proof of intent to deprive the owner of property of its use or benefit."). We disagree. "Intent, being a state of mind, is

---

[13] We note that the special standard of review for wholly circumstantial evidence does not apply here because the evidence of Mr. Garcia's guilt for making unauthorized withdrawals from Ms. Macriello's BOA account was not *entirely* circumstantial. See Knight, 186 So. 3d at 1010 (holding "that the circumstantial evidence standard of review applies only where all of the evidence of a defendant's guilt – i.e., the evidence tending to show that the defendant committed or participated in the crime – is circumstantial, not where any particular element of a crime is demonstrated exclusively by circumstantial evidence").

16

often not subject to direct proof and can only be inferred from circumstances. Benitez, 852 So. 2d at 388 (quoting Jones v. State, 192 So. 2d 285, 286 (Fla. 3d DCA 1966)). Unlike the grand theft charges premised on the checks and online transfers, Mr. Garcia's specific intent can be inferred under the circumstances outlined herein.[14] The State, therefore, presented sufficient evidence to create a jury question as to whether Mr. Garcia had the intent either to deprive Ms. Macriello of her property or to appropriate the property to his own use.

For these reasons, viewing the ATM withdrawal evidence in the light most favorable to the State, we conclude that the jury could find the existence of the elements of grand theft beyond a reasonable doubt and that, therefore, the trial court did not err in denying the motion for judgment of acquittal on this evidence.

*d. Mr. Garcia's theft conviction must be reduced to third-degree grand theft*

The State charged and indicted Mr. Garcia with second-degree grand theft, which requires that the property stolen be valued "at $20,000 or more, but less than $100,000." § 812.014(2)(b), Fla. Stat. (2013). Whereas, if the property stolen is valued between $300 and $19,999, it is grand theft of the third degree. See § 812.014(2)(c)1.-3., Fla. Stat. (2013). Because the combined value of the two ATM

---

[14] The State's presentation of direct evidence that Mr. Garcia knowingly withdrew $1,000 from the BOA ATMs under circumstances from which his specific intent to commit theft could be inferred distinguishes the two ATM withdrawals from the two $20,000 checks and the $4,700 in online transfers. See section III(I)(a)-(b), *supra*.

withdrawals is $1,000, Mr. Garcia's conviction must be reduced to third-degree grand theft. See § 924.34, Fla. Stat. (2013); Council v. State, 206 So. 3d 155, 156 (Fla. 1st DCA 2016) ("[W]e hold that the State failed to introduce competent, substantial evidence showing that the value of the stolen property exceeded $20,000, and we reverse and remand to the trial court to impose a sentence for grand theft over $10,000 but less than $20,000, a third-degree felony.").

2. Second-Degree Murder

"The corpus delicti of a homicide consists of three elements, i.e., 'first, the fact of death; second, the criminal agency of another person as the cause thereof; and third, the identity of the deceased person.'" Golden v. State, 629 So. 2d 109, 111 (Fla. 1993) (quoting Jefferson v. State, 128 So. 2d 132, 135 (Fla. 1961)). The State can prove these elements through the introduction of wholly circumstantial evidence, "even without any evidence of the discovery of the victim's body." Crain, 894 So. 2d at 72 (citing Meyers v. State, 704 So. 2d 1368, 1369 (Fla. 1997)). In this case, the parties agree that the State presented purely circumstantial evidence to prove that Ms. Macriello died through the criminal agency of Mr. Garcia. Therefore, this Court employs the special standard of review of the evidence presented at trial – i.e., whether the State presented competent evidence below from which the jury could exclude every reasonable hypothesis of innocence

18

beyond a reasonable doubt. See Hodgkins, 175 So. 3d at 746; Johnston, 863 So. 2d at 283; Law, 559 So. 2d at 188-89.

In moving for a judgment of acquittal on the homicide charge, Mr. Garcia argued that the State had failed to provide sufficient evidence that either: (i) Ms. Macriello was dead, theorizing that she had simply moved elsewhere without notifying anyone; or (ii) Ms. Macriello's alleged death was caused by any criminal act of Mr. Garcia; ergo, she died under other circumstances. Even assuming that the circumstances surrounding Ms. Macriello's sudden disappearance constitute strong circumstantial evidence of her death by the criminal agency of another, we conclude that the State's evidence was insufficient to establish that Ms. Macriello's apparent death was due to the specific criminal agency of Mr. Garcia.

*a. The circumstantial evidence introduced at trial*

The State presented significant circumstantial evidence below in support of its theory that Mr. Garcia killed Ms. Macriello in order to steal a substantial sum of money from her BOA savings and checking accounts, including:

- On June 5, 2013, an online transfer of $1000 was made from Ms. Macriello's BOA checking account to Mr. Garcia's BOA checking account.

- On June 5, 2013, an online transfer of $20,000 was made from Ms. Macriello's BOA savings account to her BOA checking account.

- On June 5, 2013, Mr. Garcia deposited a $20,000 personal check (dated June 5, 2013) written by Ms. Macriello to Mr. Garcia into his BOA checking account.

- On June 5, 2013, Mr. Garcia drove Ms. Macriello's car to a BOA drive-up ATM and used Ms. Macriello's ATM card and PIN to withdraw $500 from her BOA savings account.

- On June 10, 2013, Mr. Garcia deposited a second $20,000 personal check (dated June 10, 2013) written by Ms. Macriello to Mr. Garcia into his BOA checking account.

- On June 10, 2013, around noon, the landlord heard Ms. Macriello's car being parked in the driveway in front of Ms. Macriello's apartment building.

- On June 10, 2013, also around noon, a taxi driver picked up Mr. Garcia from a convenience store located several blocks from Ms. Macriello's home.

- On June 12, 2013, Mr. Garcia used Ms. Macriello's ATM card and PIN to withdraw $500 from Ms. Macriello's BOA savings account.

- On June 26, July 5, July 17 and August 5, 2013, online transfers were made from Ms. Macriello's BOA checking account to Mr. Garcia's BOA account, totaling $3,700.

- The interior of Ms. Macriello's vehicle smelled of cleaning agents and appeared to have been detailed thoroughly.

- Luminol (which reacts to hemoglobin in blood) sprayed in the interior of Ms. Macriello's car reacted to a fluid in the trunk (possibly detecting the outline of a purse) and to a fluid on the front passenger floorboard (possibly detecting the outline of a hammer).

- CSI found two strands of Mr. Garcia's hair in Ms. Macriello's vehicle, and one DNA sample matching Mr. Garcia on the car's center console.

- From the time Ms. Macriello was last seen (June 3, 2013) until her cellphone was shut off (July 7, 2013), numerous calls between Mr. Garcia's cellphone and Ms. Macriello's cellphone "pinged" off the

20

same cellular antenna, within the same sector, indicating that the cellphones were within close proximity to each other at the time of the calls.

- Ms. Macriello's cellphone made calls solely to voicemail and to Mr. Garcia after her disappearance.

- Mr. Garcia denied having access to Ms. Macriello's BOA accounts, and also denied taking any money from her BOA accounts.

- Mr. Garcia denied driving Ms. Macriello's car.

- Mr. Garcia never told the police about the promissory note, in Ms. Macriello's handwriting, that was found in the back of a filing cabinet drawer in his home.

### b. *Suspicious circumstances are not enough to obtain a conviction*

The State's voluminous circumstantial evidence clearly creates a strong suspicion that Mr. Garcia was responsible for Ms. Macriello apparent death. Strong suspicion, however, is not the standard for obtaining a criminal conviction based on purely circumstantial evidence. Scott, 581 So. 2d at 893. "The special standard requires that the circumstances lead 'to a reasonable and moral certainty that the accused and no one else committed the offense charged. It is not sufficient that the facts create a strong probability of, and be consistent with guilt. They must be inconsistent with innocence.'" Lindsey, 14 So. 3d at 215 (quoting Frank v. State, 163 So. 223, 223 (1935)); Orme v. State, 677 So. 2d 258, 261 n.1 (Fla. 1996) ("Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, . . . is

not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict." (quoting Davis v. State, 90 So. 2d 629, 631-32 (Fla. 1956))); Law, 559 So. 2d at 188 ("Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence.").

We find the Fourth District's opinion in Ramsammy v. State, 43 So. 3d 100 (Fla. 4th DCA 2010) to be particularly instructive. In that case, Ramsammy was convicted of murdering his wife after she disappeared without a trace. The wife's body was never found and there was no physical evidence of her death. Id. at 102. Ramsammy waited two months to report his wife's disappearance to the police, in the meantime giving relatives and friends wildly conflicting, and sometimes incoherent, explanations for her disappearance. Id. at 102-03. During the police investigation into the wife's disappearance, the police learned that the wife had an extra-marital affair with another man, and that Ramsammy had threatened repeatedly to kill the wife and her paramour. Id. at 102. Ramsammy admitted to the investigating detective that he had hit his wife after learning of the affair. Id. at 104. Ramsammy also told the detective at one point, "I'm not going to tell you that I'm innocent. I'm not going to tell you that I'm guilty. That is up to you to investigate." Id.

The jury convicted Ramsammy of second-degree murder. The Fourth District reversed on appeal, concluding that the State had failed to present sufficient evidence that Ramsammy was responsible for his wife's death:

> Here, we are confronted with a case where the victim's body has not been recovered, no evidence of the manner of death was presented, no physical evidence like blood, DNA, or any other type of forensics was found, no confession to homicide was made, and no witnesses to the crime testified. We are left only with appellant's various suspicious statements to family, friends, and law enforcement. . . . [T]here is a "strong suspicion" that appellant murdered the victim. But troubling suspicions about appellant stacked upon one another are insufficient as a matter of law. This court has found that "[c]ircumstantial evidence is insufficient when it requires pyramiding of assumptions or inferences in order to arrive at the conclusion of guilt." Brown v. State, 672 So. 2d 648, 650 (Fla. 4th DCA 1996). "Where the evidence creates only a strong suspicion of guilt or simply a probability of guilt, the evidence is insufficient to sustain a conviction." Id.

Id. at 109 (footnotes omitted).

> c. *The State's circumstantial evidence is not inconsistent with Mr. Garcia's reasonable hypothesis of innocence*

In this case, while the State established that (i) Mr. Garcia drove Ms. Macriello' car after she went missing, (ii) Mr. Garcia's DNA and hair were found in her vehicle after it had been thoroughly cleaned, (iii) luminol spray reacted to fluid in the vehicle's trunk and front passenger floorboard, and (iv) Mr. Garcia was picked up by a taxi several blocks from Ms. Macriello's residence around the same time that her vehicle reappeared in front of her apartment building, these suspicious circumstances did not serve to establish that Ms. Macriello's vehicle

23

was involved in her apparent death. Indeed, CSI found no blood or an actual weapon in Ms. Macriello's car.

Moreover, the series of financial transactions from Ms. Macriello's BOA accounts, while suspicious, are also insufficient to establish any specific criminal agency by Mr. Garcia to commit murder. As set forth herein,[15] we concluded that the State failed to establish that Mr. Garcia committed theft by depositing the two $20,000 personal checks into his BOA account, or by receiving the $4,700 in online transfers to his BOA account, the sum of which constituted the bulk of Ms. Macriello's BOA account balances. This undercuts the State's posited motive for Mr. Garcia to commit murder.

Finally, as to the cellphone records, the State argued at trial that the close proximity of Ms. Macriello's and Mr. Garcia's cellphones in the calls on the day of, and following, her disappearance, as well as the lack of any outgoing calls to anyone other than Mr. Garcia, suggested that Mr. Garcia was in possession of both cellphones the whole time. Thus, the State argued, Mr. Garcia placed the calls himself in an attempt to make it appear that Ms. Macriello was still alive, and to make himself above suspicion. Ms. Macriello's cellphone was never found. While certainly suspicious, these circumstances do not serve to establish any criminal act by Mr. Garcia with respect to Ms. Macriello's apparent death. See DeJesus v.

_____

[15] See section III(1)(a)-(b), *supra*.

24

State, 225 So. 3d 285, 288 (Fla. 4th DCA 2017) (concluding that cell site data of "Appellant's location near the scene of the crime around the time of the burglary" served to "furnish[] only a suspicion that Appellant was complicit in the charged crimes" and, therefore, was insufficient to exclude every reasonable hypothesis of innocence).

Aside from the impermissible pyramiding of assumptions and inferences drawn from the purely circumstantial evidence discussed herein, the State presented no direct evidence (physical or testimony) at trial connecting Mr. Garcia to Ms. Macriello's apparent death. See Ballard, 923 So. 2d at 482 ("[T]he circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences." (quoting Miller v. State, 770 So. 2d 1144, 1149 (Fla. 2000))); Ramsammy, 43 So. 3d at 109. This required the State to overcome every reasonable hypothesis of Mr. Garcia's innocence. See Hodgkins, 175 So. 3d at 746; Johnston, 863 So. 2d at 283; Law, 559 So. 2d at 188-89. Ms. Macriello's body was never found. There was no crime scene, no evidence of the location or manner of Ms. Macriello's death, no murder weapon, no eyewitness to the crime, and Mr. Garcia made no confession to Ms. Macriello's murder. In short, the evidence introduced at trial was insufficient to establish that Ms. Macriello died by a criminal act committed by Mr. Garcia. See Hodgkins, 175 So. 3d at 748-750 (holding that purely circumstantial evidence was insufficient to support a

conviction for murder where no murder weapon was recovered, no eyewitnesses placed the defendant at the victim's home around the time of the murder, and the State failed to present competent evidence to rebut the defendant's theory that the victim scraped his back with her fingernails during a consensual encounter days prior to the victim's murder); Ballard, 923 So. 2d at 483-84 (finding that purely circumstantial evidence was insufficient to a support conviction for murder where there were no eyewitnesses to the crime, no murder weapon was recovered, fingerprints belonging to unknown individuals were found at the crime scene, the defendant did not confess, and the State presented no evidence to refute the possibility that the defendant's prior innocent presence in the victim's home accounted for his hair and fingerprint being found at the crime scene); Ramsammy, 43 So. 3d at 108-09.

Under these circumstances, we conclude that Mr. Garcia's hypothesis of innocence – that Ms. Macriello, if dead, died under circumstances for which Mr. Garcia was not responsible – was reasonable. See Wright v. State, 221 So. 3d 512, 523 (Fla. 2017) ("Wright's hypothesis of innocence – that he was not present at the time of the murders and that someone else committed them – is not unreasonable considering the absence of any evidence to place him at the crime scene or prove his identity as the killer.").

**IV. CONCLUSION**

The State presented competent, substantial evidence from which the jury could find Mr. Garcia guilty of grand theft beyond a reasonable doubt for the two $500 ATM withdrawals. The State failed, however, to present competent substantial evidence that Mr. Garcia committed theft by either: (i) depositing the two $20,000 personal checks into his BOA checking account; or (ii) receiving the $4,700 in funds through a series of online transfers from Ms. Macriello's BOA checking account. Because the value of the property stolen is $1,000, we reduce Mr. Garcia's conviction for second-degree grand theft to third-degree grand theft and remand for resentencing. See § 924.34, Fla. Stat. (2013); § 812.014(2)(c)1., Fla. Stat. (2013).

Because the State relied upon wholly circumstantial evidence as proof of Mr. Garcia's guilt for killing Ms. Macriello, the State was required to present competent evidence from which the jury could infer Mr. Garcia's guilt for second-degree murder to the exclusion of all reasonable hypotheses of innocence. We conclude that the State failed to meet this burden. The circumstantial evidence presented at trial, which furnished nothing more than a strong suspicion that Mr. Garcia murdered Ms. Macriello, was insufficient to establish that Ms. Macriello's apparent death was due to the specific criminal agency of Mr. Garcia. We, therefore, reverse and remand this case to the trial court with directions to enter a judgment of acquittal on the homicide charge.[16]

Affirmed in part, reversed in part, and remanded with instructions.

---

[16] Because we conclude that the evidence will not sustain Mr. Garcia's conviction for second-degree murder, we need not reach the other issues raised on appeal with respect to this conviction.